## No. 11,831.

PUBLIC SERVICE COMPANY OF COLORADO *v.* WILLIAMS.

Decided July 9, 1928.   Rehearing denied September 10, 1928.

Messrs. Hodges, Wilson & Rogers, Mr. Henry C. Vidal, Mr. F. L. Collom, Mr. D. L. Webb, for plaintiff in error.

Mr. J. J. White, for defendant in error.

*Department One.*

Mr. Justice Adams delivered the opinion of the court.

Cora Williams was plaintiff, and Public Service Company was defendant, in the trial court. They will be referred to as there aligned. Plaintiff recovered judgment in an action in tort, and defendant brings the case here for review.

Complainant, a widow, is the mother of Nelson Williams, deceased, who, at the time of his death, was eighteen years of age. The complaint recites, in substance, as follows: On September 2, 1925, and long prior thereto, the defendant owned and controlled a certain pipe line, which is used to convey a large volume of water for power purposes down the mountain side from Argentine creek to one of defendant's reservoirs, known as Green lake, in Clear Creek county. The pipe line was situate near public highways, trails, and on a mountain where large numbers of persons daily and constantly frequented and passed over. The defendant, for a long period of time prior to and on the date aforesaid, wrongfully and neglectfully caused, allowed and permitted said pipe line to become and remain improperly constructed, unrepaired, disjointed, separated and unfit to carry water, and permitted and caused water to flow therein, until it was interrupted and escaped at the place where the pipe line was in the condition named; that a large volume of water therefrom struck the surface of the

mountain, flowed thereon and therein, soaked and saturated the surface of the mountain, and underneath, down to the solid formation, several hundred feet in width and length, causing large parts and portions of the surface material of the mountain, of enormous size and weight, to be ready to break and slip away, creating and causing a hidden and lurking danger, which the defendant knew, or in the exercise of reasonable care and investigation should have ascertained.

The complaint further recites that by reason of the foregoing conditions, on September 2, 1925, a tremendous mass of surface material broke and slipped, rolled and tumbled down the mountain side and gulches, several hundred feet; that the minor named was without knowledge of the dangers there existing; that he was caught and crushed in the slide, and killed. It was further alleged that deceased was a young man in good health, of exemplary habits, good ability and fair education, earning and capable of earning seventy-five dollars per month, with a prospective increasing earning capacity, and with an expectancy of life of 42.87 years. The denials in the answer put plaintiff on proof of all allegations, except defendant's corporate existence, and defendant alleged that deceased was guilty of negligence which was the proximate cause of the accident and death, and that by said negligence, deceased contributed thereto.

The pipe was made of steel, with slip joints fitting into each other, intended to overlap six inches in each length of pipe, and in fact they did so overlap when the line was kept in repair. The pipe line had a diameter of ten or twelve inches at the place of the slide. It was about 4,000 feet long, built on a one per cent grade, and carried water around the mountain above the slide area. The line extended about 235 feet across the slide area. At the locality of the slide, the pipe lay flat on the ground. The road lay about 60 to 80 yards below the pipe line where the slide occurred. Defendant's employees patrolled the line from time to time, and made frequent

improvised repairs. It was testified that one of the methods employed when leaks were found, was to calk the joints with shingles, and to wrap rags or gunnysack around the pipe, and to take a band with lugs and a bolt in it, and pull the packing as tight as it could be done, though in other instances old pipe was replaced with new, and more substantial repairs were made.

A witness testified that about five days prior to the time when the slide occurred, she and a companion were in the vicinity, and saw a stream of water about the size of her wrist, possibly larger, spurting out of the pipe. They took a drink of water above the side of the road; at first they thought the water came from a spring, but discovered on investigation that it came from the pipe line, which was concealed by bushes. The stream grew in width as it progressed down the mountain, and was two feet wide in the place where they drank from such stream. There was other evidence of other leakages in the line.

Another witness saw the movement of the slide, and testified that the first thing he noticed was the trees up on the mountain side where the pipe line lay, beginning to move up and down; there were trees and brush above and below the pipe line, which was laid right along the edge of where the break came. They were carried down with large boulders, and rocks and dirt in the terrific movement of the slide. The edge of the earth was broken down from eight to twelve feet straight from the pipe line where the slide turned loose. This witness and other witnesses testified that none of the slide came from above the pipe line. The dismembered body of deceased was found in the debris several days afterwards.

The theory of defendant is that the slide area, together with an area immediately above it of about seven and one-half acres, formed a catchment or drainage basin, in which would be and were bound to be gathered all natural waters from rain and snow, and that the saturation which caused the slide came from this source. De-

fendant offered evidence, largely of an expert nature, in support of this theory.

We have not attempted in the above outline of the facts to state all of the evidence. The record is voluminous and we have told as much of it as we deem necessary to an understanding of our opinion, in connection with other facts hereafter referred to.

1. That there was a slide of surface material down the mountain side, is not disputed. That the boy was killed by it, we think is beyond question. Counsel for defendant, however, urge that the happening of an accident, or the mere proof of the occurrence of an injury, does not necessarily establish defendant's negligence. *D. & R. G. R. Co. v. McComas*, 7 Colo. App. 121, 123, 42 Pac. 676; *City of Denver v. Spencer*, 34 Colo. 270, 276, 82 Pac. 590; *McMillan v. Keck*, 82 Colo. 434, 260 Pac. 1079. We do not gainsay this well established proposition of law, and counsel for plaintiff does not contend against it, but the authorities are not in point, because the proof of the happening of the accident was only a part of plaintiff's evidence. Without unnecessary repetition of the facts stated in the complaint, they were established by the testimony of reliable witnesses.

2. A large portion of the brief of counsel for defendant is devoted to an able argument in support of their theory, that the saturation of the soil which caused the slide, came from rains and snows. One of defendant's witnesses, an engineer, presented interesting figures and calculations, attempting to show that it was impossible that the slide was caused by water from the pipe line, and that it must have been caused by other means. He spoke with confidence, and testified also concerning a sketch map of the catchment area, or drainage area surrounding the place, but admitted that he had not examined such area. Other witnesses testified for defendant, but even if the engineer had examined the area referred to, and if defendant's theory is correct, it would seem strange to us that after the rain and snow fell there

for centuries, nature should have chosen this particular time to cleave the earth, following the course of a leaky pipe line, on the top of the ground, and should have hurled down the mountain the boulders, trees and all in its way below the pipe line, and left the earth above undisturbed. Such was also the view of one of the expert witnesses for the plaintiff. We are not acting in the capacity of jurymen in saying the above; they spoke; it was their province to determine the facts, not ours. Our observations are merely preliminary to saying that if the criticism of counsel for defendant is just, that inferences on inferences have been employed, we fear that they were made use of by defendant rather than plaintiff. The facts were disputed, and we are not justified in saying that it is a question for the court, instead of the jury, but we should be compelled to say this if we yielded to counsel's argument.

3. The trial court properly declined to exercise or usurp functions delegated to other constitutional officers, the twelve jurymen that sat in the case. *Cooper v. Newmyer*, 80 Colo. 246, 247, 250 Pac. 559; *Denver City Tramway Co. v. Brown*, 57 Colo. 484, 143 Pac. 364. Strong and persuasive arguments on questions of fact might sway jurors, perhaps including ourselves, if we were vested with their commission, and if we sat in the box, hearing and seeing as they; but such arguments are for the jury, and remain so, unless and until such questions are shown to pertain to obvious matters of fact, concerning which there can be no difference of opinion, so that they thus become questions of law. *Arps v. City & County of Denver*, 82 Colo. 189, 257 Pac. 1094, and cases there cited. The bonds of the rule are not loosened by appeal or writ of error. They are even more binding on us.

4. We quote here a number of instructions, favorable to defendant's position, given at its counsel's request. Whether they may be in some respects too favorable, we need not say, because plaintiff's counsel has not challenged them. They are quoted here because they serve a

double purpose: first, as a statement of defendant's position, substantially in the words of its own counsel, and second, they indicate that in the case to the jury, the trial judge did not deny defendant the benefit of the rules of law for which it makes its principal contentions. We quote instructions numbered two to seven, both inclusive:

"Instruction No. 2. The measure of defendant's duty with respect to the maintenance of the pipe line was that degree of care that an ordinarily prudent person would exercise under similar circumstances, taking into consideration the dangers to be apprehended and guarded against.

"Instruction No. 3. Even if you believe from a preponderance of the evidence that there was some leakage or escape of water from the pipe line at the place of the slide, nevertheless, unless you further find from the preponderance of the evidence that the slide could have been reasonably anticipated by the defendant as a result of said leakage or escape of water, your verdict must be for the defendant.

"Instruction No. 4. The defendant was in no sense an insurer of the condition of the pipe line or against the escape of water therefrom, but its duty in that respect was measured by the care that would have been exercised by an ordinarily prudent and reasonable man having regard to the risk of a slide.

"Instruction No. 5. Even if you find from a preponderance of the evidence that the water leaked or escaped from the pipe line in question at the place of the slide and that such leakage or escape caused the slide, unless you further find from the preponderance of the evidence that the leakage or escape had continued for a length of time that was unreasonable in view of all the surrounding circumstances, your verdict must be for the defendant.

"Instruction No. 6. You cannot resort to conjecture or guess as to possibilities in finding the cause of the slide, but the burden is upon plaintiff to prove by a preponderance of the evidence that defendant was negligent

in respect to the maintenance of the pipe line, as charged in the complaint, and that its negligence in this respect was the proximate cause of the slide.

"Instruction No. 7. If the evidence shows that the slide in question was caused by natural conditions or by seepage or percolating waters, or by rain or any other cause than the alleged negligence of the defendant as charged in the complaint, your verdict must be for the defendant."

5. Referring to the second and fourth instructions, which largely embody the same idea, the law is, as repeatedly announced by the courts in this and other jurisdictions, that when the measure of duty is ordinary and reasonable care, it is a question for the jury. *Phillips v. Denver City Tramway Co.,* 53 Colo. 458, 128 Pac. 460; *Rimmer v. Wilson,* 42 Colo. 180, 183, 93 Pac. 1110; *Williams v. Sleepy Hollow M. Co.,* 37 Colo. 62, 69, 86 Pac. 337; *Arps v. City and County of Denver, supra.* Whether the defendant did or did not exercise reasonable care, was a point on which there was a sharp conflict in the voluminous evidence. We can find nothing in the instant case that would have justified the court in taking the case from the jury by declaring that as a matter of law, the defendant in fact did or did not exercise reasonable care. It would have been too much to have said so under the evidence here, and thus to make mere figureheads of the jurors.

6. Counsel for defendant cite *Elkton Con. M. & M. Co. v. Sullivan,* 41 Colo. 241, 249, 92 Pac. 679, in which it is said that "mere conjecture cannot be resorted to, to supply the place of either direct or inferential proof." To same effect, *Mountain Motor Fuel Co. v. Rivers,* 65 Colo. 561, 564, 170 Pac. 1164. This is right, but those who differ with defendant's theory of the cause of the landslide, may say with reason that plaintiff's direct and inferential proof was largely met with conjecture, such as defendant's proof of engineering tests and calculations from "weeping joints," not based on the flow of water

as testified to by plaintiff's witnesses. We think such tests also merit criticism like Dean Wigmore's, in his work on Evidence, Vol. 1, at section 451, under "Instances of Material Effects, as Evidence." To quote from a note at page 800 under above section, "There were no elements of comparison offered which could afford any safe or reliable data for the judgment of a jury," nor were they "so similar that one would be any fair test for the other." Id. We are not convinced that if the rule invoked has been violated, it was done by the winning party.

7. We are not left to conjecture that water caused the landslide. In fact, both parties introduced evidence tending to show that such was the cause. The difference lay in that plaintiff's witnesses testified that it came from the pipe line, and defendant's, that the slide was superinduced by waters and snows, draining from the catchment area above. This was a vital and controlling issue, submitted to the jury, which it weighed, as was its duty. Counsel for defendant insist that if the facts proven are equally consistent with one theory as the other, it must be resolved in their favor, under the authority of *Mountain Motor Fuel Co. v. Rivers, supra.* But to say of such facts in the case at bar that they are "equally consistent," is only an assumption, to be considered in the light of the evidence, which conflicted. In the case cited, the court plainly qualified its declaration with the words, "In the absence of some evidence to the fact," referring to plaintiff's lack of evidence, but if we followed defendant's argument here, it would render every trial a farce by being compelled to say, in effect, "You may believe or disbelieve any of the witnesses, therefore you must believe mine." It cannot be. The cases would be over before commenced.

8. Concerning the third instruction given, that the verdict must be for defendant, if the slide could not have been reasonably anticipated: The position of counsel for defendant may be stated substantially in the lan-

guage of *Benedict Warehouse & Transfer Co. v. McKannon Piano Co.,* 62 Colo. 180, 185, 161 Pac. 145, as follows: " * * * Mischief from a cause which the exercise of reasonable care could not have been foreseen and anticipated, cannot be made the basis upon which to predicate negligence." And so of "an independent, intervening act which he could not have reasonably anticipated." *Town of Lyons v. Watt,* 43 Colo. 238, 240, 95 Pac. 949. See also *Fairmont Cemetery Ass'n v. Davis,* 4 Colo. App. 570, 574, 36 Pac. 911.

We follow the above rule here, but many of the authorities frankly say that it is much easier to state the rule than to apply it to particular facts, and such is our present experience, but from a comparative analysis of the conflicting testimony, it is not difficult to see how the jurors felt justified in reaching their unanimous conclusion. The dividing line between questions of law and questions of fact is often far from clear. Generally, what may be reasonably anticipated or foreseen, is a jury question. This must be qualified by the rules stated as to when it becomes a question of law. We cannot say that it is so clear that all reasonable men must think alike about it. In case of doubt, the tendency of the decisions is to abide the verdict of the jury.

Reasonable care is a comparative term; what would be reasonable and prudent in one instance, might not be in another. Concretely applied, the degree of care to be used in the maintenance of a usually placidly flowing ditch on the plains, may not be the same as to a pipe line on the mountain side above a public road, nor is it the same in the presence of known slide areas, as of outside such areas. To quote from Shearman & Redfield on Negligence, (6th Ed.) § 30, p. 62, "If the circumstances, in the presence of which he was negligent, were extraordinary, and so were likely to make the result of his negligence extraordinary, that is an additional reason why he should have been especially careful not to be negligent at such a time."

9. We have not overlooked the testimony of defendant's witnesses. One of them, Jansen, an engineer of wide experience, said that he had never known of a landslide from a pipe line. However, the fact that water from a pipe line may serve as a lubricant, as well as if it came directly from the clouds, needs no demonstration. It is true that some of defendant's testimony showed, or attempted to show, a probable difference as to results between the imperceptible flow of water through centuries of time, from that of a sudden force of water, brought to bear on the mountain side. But illustrative of different theories, Finch, also a witness for defendant, and a geologist of long and varied experience, testified that a cloud burst might cause it, and that a sudden wash out might naturally be expected to occur from a break in the pipe line. He testified further, that there is "quite an area of landslides around Clear lake; there is one that resembles this very closely just above the head of Clear lake, flowing down from the east side of the valley where there is a similar catchment area; that did not flow so far because it bumped into the other wall of the valley, but it is similar material and it flowed in the same way." It was in this general vicinity that the slide occurred which caused the death of deceased.

That a slide might possibly occur, without the intervention of human agency, is apparent. That it probably would occur, from sufficient water from a pipe line in a slide area, and that defendant knew, or might readily have known of it, is fairly deducible from the testimony, including defendant's as well as plaintiff's. The jury having been properly instructed, there is nothing left for our intervention.

We have discussed at length the features of the defense that embody defendant's principal contentions, and which were stressed by its counsel at the oral argument. We have also considered the other assignments

of error, mentioned in their briefs, but we find no reversible error in the record. The judgment must therefore be affirmed.

Judgment affirmed.

MR. CHIEF JUSTICE DENISON, MR. JUSTICE BURKE and MR. JUSTICE WALKER concur. MR. JUSTICE ADAMS, who wrote the opinion, sitting for MR. JUSTICE WHITFORD.